**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL LEVIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 C 2617 |
| | ) | |
| SUN LIFE ASSURANCE COMPANY OF | ) | Judge Rebecca R. Pallmeyer |
| CANADA, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

From May 17, 2004 to March 18, 2005, Plaintiff Michael Levin worked as a general manager

for Diagnostic Products Corporation ("DPC") in China. During his employment, Levin was a

participant in the Diagnostic Products Corporation Employee Group Benefits Plan (the "Plan"), an

employee group benefits plan issued by Defendant Sun Life Assurance Company of Canada ("Sun

Life"). In March 2005, several months after his insurance coverage began, recurring bouts of

dysphagia and aspiration pneumonia forced Levin to stop working for DPC. He has been unable

to work in any capacity since. In this action against Sun Life, Levin seeks "to recover benefits due

to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his

rights to future benefits under the terms of the plan." 29 U.S.C. §1132(a)(1)(B). It is undisputed

that, at all relevant times, the Plan constituted an "employee welfare benefit plan," as defined by

29 U.S.C. § 1002(1), and that Levin was covered under the Plan as a "participant," as defined by

29 U.S.C. § 1002(7). (*See* Ans. ¶ 8.) Accordingly, the Employee Retirement Income Security Act

of 1974 ("ERISA") governs this dispute. It is also undisputed that Levin's condition was disabling.

The parties' disagreement centers on whether Levin's claim for long-term disability benefits is

barred by the Plan's pre-existing condition exclusion. For the reasons explained below, the court

concludes that Levin's condition is subject to the Plan's pre-existing condition exclusion and

therefore enters judgment for Sun Life and against Levin.

## <u>PROCEDURAL HISTORY</u>

Sun Life has denied Levin's request for long-term disability benefits, on the ground that he suffers from a pre-existing condition, rendering him ineligible for benefits under the Plan's terms. Levin filed this action on May 10, 2006, seeking an order directing Sun Life to pay Levin disability and other employee benefits or, in the alternative, to review his appeal. (Docket Entry No. 1.) Levin also seeks prejudgment interest, an order compelling Sun Life to continue paying Levin benefits so long as he remains eligible for those benefits, an award of attorneys' fees, an award of costs, and any and all other relief to which he is entitled. (*Id.*) To resolve these claims, the parties opted to conduct a trial on the papers submitted to this court. (Docket Entries No. 30 & 32.) A trial on the papers is more akin to a bench trial than to a motion for summary judgment, and therefore governed by Federal Rule of Civil Procedure 52. *Cent. States, Southeast & Southwest Areas Pension Fund v. Phencorp Reinsurance Co.*, 530 F. Supp. 2d 1008, 1010 (N.D. Ill. 2008). To conduct this trial on the papers, the court will review the stipulated record, resolve any disputes of fact, and determine the outcome of the case. *See, e.g., Marshall v. Blue Cross Blue Shield Ass'n*, No. 04 C 6395, 2006 WL 2661039, at *1-2 (N.D. Ill. Sept. 13, 2006) (concluding that a Rule 52 trial on the papers is appropriate procedure for resolving ERISA benefits disputes, absent objections from the parties). Here, the record is presented in seven documents: Plaintiff's opening trial brief, styled as a motion for summary judgment ("Pl.'s Tr. Br."); Plaintiff's statement of facts pursuant to Local Rule 56.1 ("Pl.'s 56.1"); Defendant's Trial Brief ("Def.'s Tr. Br."); response memoranda from each side ("Pl.'s Resp." and "Def.'s Resp."); the claim record; and the February 2, 2007 deposition of Dr. Diane Flamburis. The parties have stipulated to the court's consideration of those sources. (Docket Entries No. 30 & 32.) Upon consideration of these documents, the court sets forth the following findings of fact and conclusions of law pursuant to Rule 52(a). *See Cent. States*, 530 F. Supp. 2d at 1010.

## FACTUAL BACKGROUND

Levin's relevant medical history predates the Plan's coverage. In 1998, Levin received treatment–including surgery–from Dr. Harold Pelzer for mucoepidermoid carcinoma of the tongue. (LEVIN-CLAIM-048.) This is a form of salivary gland cancer. Mark H. Beers, ed. in chief, *The Merck Manual of Diagnosis and Therapy* 843 (18th ed. 2006). According to Dr. Pelzer, after undergoing a course of concurrent radiation and chemotherapy following his surgery, Levin was restored to "normal function." (LEVIN-CLAIM-048 & 398.) Following this treatment, Dr. Pelzer has stated that, until June 2004, Levin was symptom-free. (*Id.*) Sun Life does not claim that Levin's cancer constitutes a pre-existing condition for purposes of this action.

As noted, Levin began employment with DPC as a general manager, working in China, on May 17, 2004. (LEVIN-CLAIM-229 & 680.) Levin claims total disability as of March 19, 2005 (the date after his last day worked) attributable to aspiration pneumonia and dysphagia. (LEVIN-CLAIM-677 & 680.) Dysphagia is "is difficulty swallowing," which "results from impeded transport of liquids, solids, or both from the pharynx to the stomach." *The Merck Manual* at 108. Treatment for dysphagia is directed at the cause of the condition. *Id.* at 109. Sun Life points out that Dr. Christopher McMackin's notes regarding Levin's medical condition mention dysphagia as early as February 15, 2002. (LEVIN-CLAIM-590.) According to Sun Life, dysphagia can cause aspiration pneumonia, if it results in food being aspirated into an individual's breathing passages. (Def.'s Resp. at 1 n.1.) Aspiration pneumonia is in fact "caused by inhaling toxic substances, usually gastric contents into the lungs. The result may be undetectable or chemical pneumonitis, bacterial pneumonia, or airway obstruction. Symptoms include cough and dyspnea." *The Merck Manual* at 436. An individual whose ability to swallow is impaired is at increased risk for aspiration. *Id.*

The parties agree that Levin's dysphagia and resulting aspiration pneumonia are totally disabling. (LEVIN-CLAIM-686.) They agree, further, that Levin received short-term disability benefits under the Plan. (Ans. ¶¶ 10-11.) Since leaving his job with DPC, Levin has not resumed

work, either for DPC or elsewhere (Pl.'s Tr. Br. at 2), and he therefore seeks long-term disability benefits. Sun Life denied Levin's long-term disability claim (claim number 120505-0511-00) on September 21, 2005. (LEVIN-CLAIM-677 to 687.) The basis for this denial—and the resulting litigation—is Sun Life's position that Levin's dysphagia and aspiration pneumonia were pre-existing conditions excluded from the scope of the Plan's coverage. Assessing this conclusion requires an analysis both of the Plan's language and of Levin's medical history.

## I.    The Plan

The Plan has an effective date of January 1, 2004. (LEVIN-BKLT-01.) The parties agree that it is an employee benefit plan sponsored by DPC for the benefit of its employees under Group Policy No. 88449. (Ans. ¶ 6.) Pursuant to the Plan, Sun Life, which issued the Plan, agrees to pay certain employee benefits in accordance with the Plan's terms, including long-term disability insurance for covered employees. (LEVIN-BKLT-01 & 06.) All full-time employees scheduled to work at least thirty hours per week are eligible for coverage on the first day of the month following the date of employment. (LEVIN-BKLT-04.) The extent of the available long-term disability coverage varies based on the employee's age at the time of his or disability (the specific amounts of coverage are not relevant to this action).

Levin claims that, as of March 19, 2005, he was totally disabled and therefore entitled to long-term disability benefits under the Plan. The Plan defines the term "total disability" as follows:

> **Total Disability or Totally Disabled** means during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation. After Total or Partial Disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience.

(LEVIN-BKLT-15.) The Plan defines the "elimination period" as a period of continuous days of total or partial disability for which no long-term disability benefit is payable. (LEVIN-BKLT-13.) The schedule of benefits for long-term disability income insurance specifies that the period is the later

of either ninety days from the day of partial or total disability, or the end of the short-term disability maximum benefit period.  (LEVIN-BKLT-06 & 13.)  It is undisputed that, while Levin was covered under the Plan, Levin sought medical treatment for dysphagia and aspiration pneumonia, both in China and in the United States.  (*See* Def.'s Tr. Br. at 8-9.)  Nor does Sun Life contest that these conditions are, in fact, disabling to Levin.

Instead, Sun Life focuses on whether Levin is precluded from collecting benefits based on the Plan's pre-existing condition exclusion.  That exclusion provides:

> **Pre-Existing Condition** means during the 3 months prior to the Employee's Effective Date of Insurance the Employee:
>
> - received medical treatment, consultation, care or services, including diagnostic measures, or took prescribed drugs or medicines; or
>
> - had symptoms which would have caused an ordinarily prudent person to have consulted a health care provider for diagnosis, care or treatment.

(LEVIN-BKLT-38.)  Although neither party presses this point, on its face the exclusion appears to preclude coverage if an individual received any sort of medical treatment, consultation, care, or services–or experienced symptoms–regardless of whether the treatment or symptom relates to the condition that ultimately results in disability.  Governing law limits the scope of the pre-existing condition exclusion, however, providing that such an exclusion "must relate to a condition (whether physical or mental), regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received within the" pre-existing condition period specified in the Plan. 29 C.F.R. § 2590.701-3(a)(2)(i).  As neither party contests this, the court assumes that the Regulation's mandate is incorporated into the Plan's exclusion.  The effective date of Levin's coverage under the Plan is June 1, 2004, which is the first day of the month following the start of his employment with DPC on May 17, 2004.  (Def.'s Tr. Br. at 2; Pl.'s 56.1 ¶ 11.)  As a result, the critical time runs from runs from March 1, 2004 through May 31, 2004 (hereafter the "pre-existing condition period").  (Def.'s Tr. Br. at 2; Pl.'s 56.1 ¶ 12.)  Levin is disqualified from recovering benefits

during that period if he received treatment for or had severe symptoms of the condition that now renders him disabled.

## II.    Levin's Medical History

During the pre-existing condition period, Levin visited two health care providers. First, Levin visited Dr. Harold Shrifter on May 20, 2004. (LEVIN-CLAIM-572.) During that examination, Levin reported to Dr. Shrifter that his appetite was "not changed" (though it is not clear from when) but that he was ingesting mostly liquids and soft foods. (*Id.*) To supplement this diet, Levin drank about four cans of Ensure (a nutritional shake) per day. (*Id.*) He avoided certain foods, because they got stuck in his esophagus, and, in particular, bread caused him to regurgitate. (*Id.*) Although no evidence supports or disproves this concern, Levin believed that he was losing weight. (*Id.*) Levin also suffered from dry mouth. (*Id.*) He did not smoke cigarettes or drink alcohol, and he reported being able to work out several times a week. (*Id.*) Levin did not suffer from coughing, chest pains, or palpitations. (*Id.*)

Levin also visited Dr. John M. Turner, a dentist, during the pre-existing condition period. (LEVIN-CLAIM-668.) On May 17, 2004, Levin had a cleaning appointment with Dr. Turner, who found that decay had "severely compromised" many of Levin's teeth. (LEVIN-CLAIM-668.) Dr. Turner attributed this to severely reduced salivary flow. (*Id.*) As a result, Dr. Turner prescribed an antibiotic (PennVK 500) for Levin to carry with him in case he had an emerging odontogenic infection–an infection arising in the teeth or tissue surrounding the teeth–while out of town or away from dental care. (*Id.*) Dr. Turner also prescribed the use of fluoride, to prevent future decay. (*Id.*) According to documentation Dr. Turner provided Sun Life, he explained to Levin that the prescription was a "safety measure" during his cleaning appointment. (*Id.*) Levin claims that this precautionary measure was necessary because Levin was scheduled to leave for China shortly. (Pl.'s Resp. at 10.)

The next relevant events in Levin's medical history occur between June 2004 and May

2005, when it is undisputed that Levin received medical care for aspiration pneumonia and dysphagia. (Def.'s Tr. Br. at 8-9.) A concise discussion of this treatment can be found in a September 2005 memorandum provided by an independent consultant–Dr. Burt W. Hall–who evaluated Levin's medical records at Sun Life's request. (LEVIN-CLAIM-671 to 674.) In that report, Dr. Hall noted that Levin sought medical care for his cough, weight loss, and increased mucous production in China in July 2004; he was diagnosed with pneumonia and treated with antibiotics. (LEVIN-CLAIM-671.) In follow-up visits, Levin's pneumonia improved, but he continued to be plagued by coughing. (*Id.*) In August 2004, Levin saw an ENT consultant regarding his cough. (*Id.*) Levin's coughing eventually was linked to aspiration. (*Id.*) In December 2004, Levin visited Dr. Pelzer in the United States. (LEVIN-CLAIM-672.) When Dr. Pelzer saw Levin on December 20, 2004 (the first time Dr. Pelzer had treated Levin since June 2003), Dr. Pelzer observed that "Levin had undergone progressive dysphagia in the preceding months and had undergone at least one bout with aspiration pneumonia." (LEVIN-CLAIM-048.) According to Dr. Pelzer, Levin was "doing well" during the time of that visit. (*Id.*) Carrie McBreen, Associate Director of the Northwestern University Voice, Speech and Language Service and Swallowing Center, reported that a videofluoroscopic swallowing assessment performed on that date revealed a significantly weak pharyngeal swallow response and aspiration of "all consistencies." (LEVIN-CLAIM-215.) Levin was "seen briefly for outpatient swallow therapy" and received a swallow exercise program to continue in China. (Id.*)

Then, in January 2005, Levin was hospitalized in China for aspiration pneumonia, treated with antibiotics, and released. (LEVIN-CLAIM-671.) He returned to the hospital, again for pneumonia, from March 18 through March 24 of 2005. (*Id.*) It is as of this March 18 date that Levin claims the illness became disabling; his period of disability begins on March 19, 2005. From China, Levin was airlifted to a hospital in Bangkok, Thailand on March 24, where he remained through April 9, 2005. (LEVIN-CLAIM-671 to 672.) Due to his aspiration and weight loss, the doctors inserted

a percutaneous esophagogastrostomy ("PEG") feeding tube. (LEVIN-CLAIM-672.) Levin returned to the United States shortly thereafter, where he sought treatment from Dr. Pelzer on April 20, 2005. (*Id.*) At the time of this appointment, Levin's PEG tube remained in place, and Levin discussed with Dr. Pelzer strategies to prevent aspiration and improve his swallowing. (*Id.*) According to Dr. Pelzer, Levin's physical examination was entirely normal, and Dr. Pelzer concluded, without elaboration, that he was free of disease. (*Id.*) McBreen recounts that a second videofluoroscopic swallowing assessment performed on that date revealed that Levin still had significantly weak pharyngeal swallow response and aspiration of "all consistencies." (LEVIN-CLAIM-215.) It was recommended that he continue receiving nutrition through the PEG tube and that he undergo a twelve-week intensive swallowing therapy program. (*Id.*)

Levin also visited a Dr. Jyoti Patel during this timeframe. (LEVIN-CLAIM-209 & 672.) A May 3, 2005 note from Dr. Patel's nurse practitioner, Patricia O'Keefe, indicates that a CT-scan was performed, which revealed bilateral pneumonia and an enlarged mediastinal lymph node. (*Id.*) O'Keefe's note also indicated that Levin had lost thirty-six pounds since March 2005. (*Id.*) O'Keefe saw Levin again in June 2005; notes from that visit record that he was feeling well, had no shortness of breath, had no cough, and had no fever. (*Id.*) A second CT-scan revealed improvement in the mediastinal lymph node. (*Id.*) Levin was ingesting a combination of Ensure and Prosure–in total about ten cans per day. (*Id.*) The treatment plan included continued use of the PEG tube as well as continued speech and swallow therapy. (*Id.*) As of September 2005, Dr. Hall opined that it would be "virtually impossible" for Levin to leave his house for any lengthy period of time, as he remained dependent on a nutritional supplemental diet with Ensure dripped into his PEG feeding tube or fed via a large syringe. (LEVIN-CLAIM-674.) Until Levin is able to ingest food without the feeding tube or syringe, "portability can be problematic." (LEVIN-CLAIM-674.)

### III. Levin's Coverage Claim

Sun Life received Levin's claim for long-term disability benefits on May 12, 2005. (LEVIN-

CLAIM-128.) On May 18, Sun Life responded to his request, noting that, because Levin's claim was made within the first twelve months in which he was insured under the Plan, his claim was subject to a routine review for potential pre-existing conditions. (*Id.*) Sun Life therefore requested a list of all medical providers who had provided Levin with any treatment from January 1, 2004 to the present. (*Id.*) In a June 3, 2005 phone call, Levin discussed his illness, claim, and the pre-existing condition exclusion with a Sun Life representative. (LEVIN-CLAIM-175-79.) On June 10, 2005, Levin had an in-person meeting with a Sun Life representative. (LEVIN-CLAIM-169-73.) The employee statement Levin provided in conjunction with that meeting listed seven treatment providers, but did not mention Dr. Shrifter or Dr. Turner. (LEVIN-CLAIM-197.) At the end of that month, Sun Life sent Levin a letter requesting copies of medical records from his treating physicians, a list of all physicians who performed the original surgery for Levin's carcinoma, a list of treating physicians in the Washington D.C. area, and pharmacy records. (LEVIN-CLAIM-238.) In a July 12, 2005 response, Levin indicated that Dr. Pelzer performed his surgery for the carcinoma, and that Levin visited Dr. Bruce J. Davidson in the Washington, D.C. area for cancer check-ups. (LEVIN-CLAIM-254-55.) He also forwarded his Beijing hospital records and authorized disclosure of his Northwestern records, including those related to Dr. Pelzer's treatment. (*Id.*)

Ultimately, Sun Life obtained copies of Levin's pharmacy records. Those records–provided by CVS Pharmacy on July 13, 2005–revealed that Levin had filled prescriptions from Dr. Turner on three occasions, one prescription on November 10, 2003 and two on May 17, 2004 (his date of hire with DPC); all were filled in Washington, D.C. (LEVIN-CLAIM-352.) In addition, the records revealed that Levin had filled prescriptions from Dr. Shrifter on three occasions: May 21, 2004; December 18, 2004; and May 18, 2005. (LEVIN-CLAIM-354.) All were filled in Chicago, Illinois. (*Id.*) Levin concedes that he visited Dr. Shrifter and Dr. Turner during the pre-existing condition period but claims that he did not disclose those visits to Sun Life because the company requested a list of treatment providers, and Levin had visited those practitioners only for prophylactic check-

9

ups. (Pl.'s Resp. at 12-13.) While he received prescriptions from both Dr. Shrifter and Dr. Turner, he notes that he was leaving the United States for work in May 2004 and might have needed those prescriptions abroad. (*See* Pl.'s Resp. at 10.)

The significance of those visits to Dr. Shrifter and Dr. Turner is disputed. To assist in analyzing the visits, Sun Life asked medical professionals to review and comment on Levin's medical history. First, Sun Life enlisted Loretta Dionne, a registered nurse. (LEVIN-CLAIM-007 & 683 to 684.) On September 7, 2005, Dionne observed that Dr. Shrifter had noted during the May 20, 2004 visit that Levin experienced dry mouth and food sticking in his esophagus as well as that Levin consumed only liquids and soft food, drank a lot of Ensure, avoided bread, and appeared to be losing weight. (LEVIN-CLAIM-007.) Dionne therefore characterized this visit as "documented treatment of symptoms due to his diagnosis of Carcinoma of the Tongue with Dysphagia." (*Id.*) Dr. Hall, the consulting physician mentioned earlier, also reviewed the file for Sun Life, and provided his own analysis of Levin's medical records in a September 13, 2005 letter. According to Dr. Hall, Levin visited Dr. Shrifter on May 20, 2004 "for further evaluation of weight loss, which presumably was also directly related to the claimant's underlying condition of dysphagia." (LEVIN-CLAIM-674.) Dr. Hall also indicated that Levin's diet, consisting largely of soft foods and Ensure products, constituted a treatment for dysphagia. (*Id.*) Finally, Dr. Hall opined that Levin would not have developed the "dysphagia/aspiration pneumonia problem" absent his history of tongue cancer and ensuing treatment. (*Id.*)

Based on this information, Sun Life issued a letter denying Levin's claim for long-term disability benefits on September 21, 2005. (LEVIN-CLAIM-677 to 687.) According to Sun Life, Levin's condition was indeed totally disabling, but it was also pre-existing and thus excluded from coverage. (LEVIN-CLAIM 686.) On October 12, 2005, Levin appealed the denial of benefits and requested a copy of the claim file to use in compiling a detailed appeal letter. (LEVIN-CLAIM-067 to 068.) Sun Life received Levin's initial letter of appeal on October 17, 2005, and sent Levin a

copy of his file that same day. (LEVIN-CLAIM-795.) On January 9, 2006, Levin's counsel faxed a letter in support of his appeal of this decision to Sun Life; counsel had originally dated and sent the letter on December 22, 2005, but Sun Life did not receive it at that time and had already affirmed its denial of Levin's claim on January 4, 2006. (LEVIN-CLAIM-003, 50 to 56, & 774 to 776.) Along with the second copy of this letter in support of his appeal, Levin included additional information from Dr. Shrifter and from Dr. Pelzer, each of whom responded to the assessments of Dr. Hall.

Dr. Shrifter–the physician who saw Levin during the pre-existing condition period–was asked to respond to Dr. Hall's assessment of that visit. (LEVIN-CLAIM-057.) In a November 14, 2005 letter, Dr. Shrifter clarified that Levin came to him in May 2004 for a "complete checkup." (*Id.*) Levin's only complaint was that he was losing weight, but that concern was belied by the fact that Levin was more than twenty pounds heavier than he had been at his "previous exam"–though there is no information regarding when that previous examination occurred, or what Levin's weight was at the time. (*Id.*) During his May 2004 appointment, Dr. Shrifter reported, Levin did not complain of coughing, dysphagia, pain, or palpitations. (*Id.*) Dr. Shrifter had not prescribed Levin any medication or offered him any treatment or therapy with respect swallowing. (*Id.*) To the contrary, Dr. Shrifter commented that, as of May 2004, Levin was in good health and had no medical complications. (*Id.*) Having reviewed Dr. Hall's assessment that Levin had a pre-existing condition under the Plan's terms, Dr. Shrifter responded that he "disagree[d] entirely with that statement, since the examination of May 20, 2004, did not involve any complaints or discussion of any symptoms regarding dysphagia, nor was there any treatment for dysphagia." (LEVIN-CLAIM-057 to 058.) Dr. Shrifter did not "basically disagree" that Levin's carcinoma of the tongue might ultimately have led to his dysphagia and aspiration pneumonia, but he noted that the carcinoma was in complete remission and was not treated during the May 20, 2004 visit–or at any time near that visit. (LEVIN-CLAIM-058.) Finally, Dr. Shrifter expressed disagreement with Dr. Hall's

11

suggestion that a cause-and-effect relationship existed between the 1998 cancer treatment and his dysphagia six years later. (*Id.*) Dr. Shrifter was apparently concerned that Sun Life might attempt to characterize Levin's cancer as a pre-existing condition that excluded him from coverage for other, unrelated symptoms; as discussed above, however, Sun Life makes no such claim in this action.

Likewise, Dr. Pelzer was asked to comment on whether Levin received "treatment, consultation, care or services, including diagnostic measures, or took prescribed drugs or medicines for dysphagia or aspiration pneumonia" during the pre-existing condition period. (LEVIN-CLAIM-48.) In a December 19, 2005 letter, Dr. Pelzer opined:

> [G]iven the stability in Mr. Levin's condition, I can state to a reasonable degree of medical certainty that there was no diagnosis, treatment, or consultation regarding problems with dysphagia or aspiration pneumonia during the [pre-existing condition period]. From the information I obtained, including a history taken in December 2004, Mr. Levin was symptom free until after he arrived in China in June 2004. Although there may be a relationship between Mr. Levin's history of carcinoma and his current impairments, his present condition did not manifest itself until June 2004; and Mr. Levin had no symptoms of which I am aware prior to Mr. Levin's arrival in China.

(*Id.*) Dr. Pelzer also expressly disagreed with Dr. Hall's memorandum. (*Id.*) Pointing out that Dr. Hall did not consult with Dr. Pelzer or with Dr. Shrifter, Dr. Pelzer concluded that from his knowledge of Levin's health and treatment, "there is no doubt that he was symptom free and had received no consultation, treatment, or medication from me for dysphagia or aspiration pneumonia" during the pre-existing condition period. (*Id.*)

On February 16, 2006, Sun Life forwarded Levin's medical records and the physicians' assessments to Dr. Diane Flamburis–who specializes in general internal medicine–for her review. (LEVIN-CLAIM-782.) In a March 4, 2006 File Review, Dr. Flamburis considered whether Levin had received treatment during the pre-existing condition period. (File Review, Docket Entry No. 30-18 at 3.) She concluded that there was discussion of dysphagia in Levin's appointment with Dr. Shrifter, based on the facts that: Dr. Shrifter's notes mentioned dysphagia, Levin had been using

Ensure since his original diagnosis and treatment in 1998, and Levin had self-modified his diet. (*Id.* at 10.) She noted that Dr. McMackin's notes specifically mention that Levin was using Ensure in 2002. (*Id.*) Dr. Flamburis characterized Levin's dietary modifications and use of Ensure as "medical treatment." (*Id.*)[1]

Dr. Flamburis also commented more specifically on whether Levin's visit to Dr. Shrifter could be considered medical treatment. According to Dr. Flamburis, Dr. Shrifter probably did not provide recommendations for further treating or diagnosing Levin's condition because Levin's weight was stable, he had no cough, and he appeared to be doing well with the dietary modifications he had adopted. (*Id.*) Despite this, according to Dr. Flamburis, Dr. Shrifter "was amiss" in not referring Levin for further evaluation for dysphagia after the May 20, 2004 appointment. (Flamburis Dep. 35:24-36:8, Docket Entry. No. 30-17.) It was "without a doubt" that the symptoms Levin reported during that appointment constituted a dysphagia diagnosis. (*Id.* at 47:7-14.) When specifically asked at her deposition how Levin's visit to Dr. Shrifter could constitute medical treatment, consultation, care, or services or a diagnostic measure, given that he "didn't do anything," Dr. Flamburis responded: "It doesn't. You are absolutely correct." (*Id.* at 42:22-43:3.) She later submitted an errata sheet, changing her response to state that the medical history Dr. Shrifter took at the appointment "clearly indicated" that Levin suffered from dysphagia and was treating his symptoms through diet; thus, according to Dr. Flamburis, Dr. Shrifter should have recommended that Levin undergo additional diagnostic symptoms. (Flamburis Dep. at Errata Sheet.) The court is permitted to consider both Dr. Flamburis's original and amended response: in this case, as in *Thorn v. Sundstrand Aerospace Corporation*, what the witness

---

[1] The Plan provided for an exception to the pre-existing exclusion when the claimant's disability began at least twelve months after the effective date of insurance, or when the claimant has been insured under the Plan for the three months immediately preceding his disability and received no treatment, care, or services during that time period. (LEVIN-BKLT-38.) Levin did receive treatment during the relevant period (from March 1, 2005 through May 31, 2005) (Docket Entry No. 30-18 at 10), and does not argue that the exception applies in this case.

> tried to do, whether or not honestly, was to change [her] deposition from what [s]he said to what [s]he meant. Though this strikes us as a questionable basis for altering a deposition, it is permitted by Fed. R. Civ. P. 30(e), which authorizes "changes in form or substance", though fortunately the rule requires that the original transcript be retained (this is implicit in the provision of the rule that any changes made by the deponent are to be appended to the transcript) so that the trier of fact can evaluate the honesty of the alteration.

207 F.3d 383, 389 (7th Cir. 2000) (internal citations omitted). Consequently, the court concludes that Flamburis has provided qualified testimony that Levin's visit to Dr. Shrifter constituted medical treatment.

Dr. Flamburis did not discuss Levin's visit to Dr. Turner in her report, but she did respond to questions about that visit during her deposition. In Dr. Flamburis' view, Levin's visit to Dr. Turner was also significant. Dr. Turner observed that Levin had diminished salivary flow and rampant tooth decay, which could have been the source of the bacteria that caused Levin's infection for aspiration. (Flamburis Dep. 26:18-27:16.) Such poor saliva flow is a well-known complication of radiation therapy. (*Id.* at 28:24-29:7.)

Likewise, Dr. Flamburis believed that Levin's personal symptoms–including food sticking in his esophagus and regurgitation–would have led a "sound person" to seek further diagnosis or treatment because it "is not normal." (Flamburis Dep. 38:4-17.) In fact, Dr. Flamburis believed that Levin was already treating himself for dysphagia. There is no drug prescription available for dysphagia, but Ensure and other dietary supplements are the recommended treatment for the condition. (*Id.* at 43:21-44:7.)

In addition to her conclusion that Levin received treatment for dysphagia in May 2004, Dr. Flamburis commented on what she deemed the "clear causality" between Levin's mucoepidermoid carcinoma of the tongue and his later salivary dysfunction and dysphagia. (Docket Entry No. 30-18 at 10.) During her deposition, Dr. Flamburis expounded on this causality, noting that Levin's dysphagia, in turn, led to his aspiration pneumonia. (Flamburis Dep. 22:13-23.)

After receiving Dr. Flamburis' assessment, Sun Life concluded in an April 4, 2006 letter to

14

Levin that the pre-existing condition exclusion applied to Levin's case, and reaffirmed its decision denying Levin's claim for disability benefits. (LEVIN-CLAIM-795 to 798.) Levin appeals that determination in this action. According to Defendant, there are three reasons that it properly denied coverage in this case: (1) Levin was treated for dysphagia during the pre-existing condition period; (2) Levin visited a doctor and a dentist during the pre-existing condition period as a result of the symptoms for which he seeks coverage; and (3) Levin had symptoms of dysphagia during the pre-existing condition period that would have prompted an ordinarily prudent person to consult with a healthcare provider. (Def.'s Resp. at 1.)

## ANALYSIS

### I.      Jurisdiction

This court has jurisdiction over Plaintiff's claim pursuant to 29 U.S.C. §§ 1132(e)(1) and 1132(f), because this action is brought pursuant to 29 U.S.C. § 1132(a)(1)(B).

### II.     Legal Standard

Although all plans require an administrator to determine whether a participant is entitled to receive benefits under the plan, that does not mean that the administrator's determination is entitled to discretion. *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 637 (7th Cir. 2005). Here, based on the Plan's language, the parties agree that the Plan administrator does not have discretion over interpretation of the Plan. (Def.'s Tr. Br. at 16; Pl.'s Tr. Br. at 7.) Thus, the court reviews Sun Life's denial of benefits under the Plan *de novo*. *Diaz*, 424 F.3d at 636-37 (citing *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 115 (1989)). Moreover, Sun Life bears the burden of proving Levin's lack of entitlement to benefits because its denial of coverage to Levin is based on an exclusionary clause within the Plan. *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997); *Dolezal v. Concert Health Plan*, 433 F. Supp. 2d 886, 891 (N.D. Ill. 2005).

### III.    Levin's Disability

The parties agree that Levin's disabling condition at the time of his disability was a

combination of dysphagia and aspiration pneumonia. According to Dr. Hall's assessment, Levin's current disabling condition is dysphagia: he cannot eat solids or drink liquids by mouth, thereby requiring him to receive nutrition through a PEG feeding tube or a large syringe. (LEVIN-CLAIM-674.) As a result of these restrictions, he has difficulty leaving home for long periods of time. (*Id.*) Dr. Flamburis has echoed that Levin is "clearly unable to work outside the home in any capacity, as he is attached during the daytime to an intravenous pole for continuous PEG tube feeding and is attending daily speech therapy sessions." (Docket Entry No. 30-18 at 10.) It therefore appears that dysphagia–which has at times caused Levin to suffer from disabling aspiration pneumonia as well–is the disabling condition at issue here. While Levin has struggled with bouts of aspiration pneumonia, which resulted in repeated hospitalizations and extensive treatment, there is no indication in the record that he battles that condition on an ongoing basis. More importantly, it appears clear that his dysphagia is, in and of itself, a disabling condition. Accordingly, the court will focus on Levin's dysphagia when assessing his right to coverage.

IV. **Dietary Modifications as Treatment**

Sun Life contends that Levin's dietary modifications, including his ingestion of soft foods and several cans of Ensure each day, constitute "appropriate medical treatment for the underlying dysphagia." (Def.'s Tr. Br. at 20.) Flamburis confirms that dietary modifications and use of Ensure should be considered medical treatment for dysphagia. (Docket Entry No. 30-18 at 10.) Dr. Hall echoed this assessment. (LEVIN-CLAIM-674.) The court concludes that Sun Life has met its burden of proving that Levin's dietary modifications were proper medical treatment for his underlying dysphagia. Indeed, Dr. McMackin's February 2005 notes list dysphagia among his symptoms and "Ensure 3-4 can/day" among his medicines. (LEVIN-CLAIM-590.) In other words, using Ensure as a dietary supplement was a medically-prescribed treatment for Levin's difficulty swallowing as early as 2002. The Plan language makes clear that the exclusion is triggered if, in the three months before insurance coverage commences Levin "received medical treatment..." It

includes no requirement that Levin receive medical treatment for the first time during that period; it is enough that he continued a treatment once prescribed by Dr. McMackin for his dysphagia. Consequently, Levin received treatment for dysphagia during the pre-existing condition period, thereby triggering the exclusion at issue.

## V.    Levin's Symptoms

Regardless of whether Levin's self-treatment constituted medical treatment, Sun Life contends that the pre-existing condition exclusion applies because the severity of Levin's symptoms would have caused an ordinarily prudent person to have consulted a health care provider for diagnosis care or treatment.  (Def.'s Resp. at 11.)  Dr. Shrifter's May 20, 2004 notes reflect that Levin was suffering from dry mouth.  (LEVIN-CLAIM-572.)  He ingested liquids and soft foods, including about four cans per day of Ensure.  (*Id.*)  He was unable to eat chicken or turkey at all and he avoided bread, because trying to eat it caused regurgitation.  (*Id.*)  Food got stuck in his esophagus.  (*Id.*)  In addition, Dr. Turner's notes make clear that he had reduced salivary flow, which caused rampant tooth decay.  (LEVIN-CLAIM-668.)

The court can find no relevant case law regarding the ordinarily prudent person standard in this context but readily concludes that an ordinarily prudent person would seek medical care for the sorts of symptoms Levin experienced.  Dr. Flamburis confirmed that Levin's symptoms were "not normal" and would have led a "sound person" to seek further diagnosis or treatment.  (Docket Entry No. 30-17 at 38:4-17.)  Levin's symptoms were clearly causing him significant inconvenience and health consequences.  Indeed, it is significant that Levin reported these symptoms to Dr. Shrifter, as it demonstrates that he appreciated the importance of seeking medical care to monitor and assess his difficulty swallowing.  An ordinarily prudent person who could not eat such basic foods as bread, chicken, or turkey would seek medical care.  That Levin's history of cancer might have explained the source of his symptoms would not render the symptoms any less troubling to an ordinarily prudent person.   For this independent reason, Levin's condition is subject to the

Plan's pre-existing condition exclusion.

## VI.    Visits to Health Care Providers as Treatment

Finally, Sun Life contends that the symptoms Levin reported to health care providers were substantial, thereby triggering the pre-existing condition limitation. (Def.'s Tr. Br. at 16-23.) When invoking the pre-existing condition exclusion, Sun Life contends that it is significant that Levin did not merely exhibit "trivial" symptoms before the coverage period began but, rather, exhibited symptoms which lead to the "inescapable conclusion" that he had dysphagia and aspiration pneumonia. *See Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 432 (7th Cir. 1994). In *Bullwinkel*, the insured detected a lump in her breast in July 1991. *Id.* at 430. When she visited a doctor on July 20, an ultrasound revealed the lump to be a cyst, which the doctor said was likely benign–but could be cancerous. *Id.* Her insurance coverage period began on July 31, but it included a six-month pre-existing condition period. *Id.* In September, a surgeon removed the lump, and further testing revealed it to be malignant. *Id.* The insurance company denied coverage for her subsequent surgery and cancer treatments, ruling the cancer to be a pre-existing condition, or a condition for which the insured was "seen, treated, diagnosed, or incurred medical expense" during the pre-existing condition period. *Id.* Affirming this determination, the Seventh Circuit noted that the insured's symptoms experienced during the pre-existing condition period were "not trivial and inconclusive." *Id.* at 432. In addition, even though the insured did not know that she had breast cancer during the pre-existing condition period, her doctor visits "actually concerned" the same condition for which she later sought insurance coverage. *Id.* Finally, in *Bullwinkel*, there was no argument to refute the inference–based on the fact that the insured's lump was cancerous in September 1991–that it was also cancerous in July 1991. *Id.* The insured never contended that anything other than cancer could have caused her breast lump. *Id.* at 433. Thus, the Seventh Circuit found that the condition was, in fact pre-existing and thus excluded from the health insurance coverage.

Sun Life notes that other courts have applied similar analysis. In a holding the *Bullwinkel* court discussed, an insured was diagnosed with bacterial endocarditis during the coverage period, but doctors confirmed that the condition was pre-existing. *Kirk v. Provident Life & Acc. Ins. Co.*, 942 F.2d 504, 505 (8th Cir. 1991).[2] The insured began consulting with a physician in March 1998. *Id.* By March 23, that physician suspected that a congenital heart disease might have produced a bacterial vegetation (or growth) in the insured's heart lining, thus causing the insured's symptoms, but a blood culture did not confirm that suspicion. *Id.* at 506-507. Then, on May 1, the insured's insurance coverage commenced. *Id.* at 505. In April and May, the insured was "relatively symptom-free," but his symptoms worsened thereafter; he was admitted to the hospital in July, where an echocardiogram showed a vegetation on his aortic valve. *Id.* at 506. This condition was identified as bacterial endocarditis, or a heart valve infection, and the insured underwent surgery on July 22, 1988. *Id.* The Eighth Circuit found that the insured was properly denied coverage under the Policy's pre-existing condition exclusion, because "[t]he doctors who examined [the insured] were in agreement that the symptoms for which [the insured] sought treatment in March 1988, stemmed from bacterial endocarditis; that is, the disease first manifested itself, or became active, in March." *Id.*

In the final case on which Sun Life relies, the relevant insurance policy excluded coverage for any sickness or injury for which the insured "received medical treatment or consultation," "had medical care or service(s)," "had diagnostic test(s)," or "took prescribed drug(s) or medicine(s)" within ninety days of the first date of insurance coverage. *Cury v. Colonial Life Ins. Co.*, 737 F.

---

[2]     The exclusion at issue in *Kirk* provided that "no benefits [were] payable for expenses due to any Injury or Illness beginning before the effective date of the coverage." 942 F.2d at 505. In light of the breadth of this exclusion, the *Bullwinkel* court found the *Kirk* holding non-determinative. *Bullwinkel*, 18 F.3d at 432. For the same reason, the *Kirk* analysis, while instructive, is of limited value here. The Plan's pre-existing condition limitation is concerned not with the date on which Levin's illness manifested itself but rather with whether Levin had symptoms of or received medical treatment, consultation, care, services, or diagnostic measures for that illness.

Supp. 847, 849 (E.D. Pa. 1990). In addition, the policy specifically excluded coverage for disabilities caused by, contributed to by, or resulting from a pre-existing condition, if that disability began within twelve months of the first date of insurance coverage. *Id.* The insured's coverage commenced on August 21, 1986, only a few weeks before the insured was diagnosed with multiple sclerosis. *Id.* The insured stopped work due to her total disability in January 1987. *Id.* But she first experienced symptoms related to multiple sclerosis, and visited a doctor for those symptoms, in 1985. *Id.* at 850. The court deemed it irrelevant that the insured's condition was not diagnosed before the coverage period commenced. *Id.* at 854. Instead, the court focused on the insured's May 1986 MRI (the most reliable test for detecting multiple sclerosis) and accompanying report deeming multiple sclerosis a "likely diagnosis" as well as a June 17, 1986 office visit in which a physician "confirm[ed] the existence of the classic symptoms of multiple sclerosis, and . . . informed plaintiff that her studies were consistent with multiple sclerosis." *Id.* at 851-2, 855. The court held that this constituted medical treatment and/or consultation in connection with the insured's multiple sclerosis, thereby triggering the pre-existing condition exclusion. *Id.* at 856. Thus, it found insurance coverage was properly denied.

Levin contends that this case is not like *Bullwinkel*, *Kirk*, or *Cury*. Instead, Levin urges that this case is analogous to *Pitcher v. Principal Mutual Life Insurance Company*, 93 F.3d 407 (7th Cir. 1996). The exclusion in *Pitcher* denied health insurance coverage for "a sickness or injury for which a Member . . . received *treatment or service* in the 90-day period before he or she became insured under this policy." *Id.* at 409. The coverage period began on September 17, 1992. *Id.* But the insured had made three visits to the doctor during the pre-existing condition period: (1) a July 31 routine physical examination during which breast lumps were identified, though they were believed to result from the insured's fibrocystic breast condition; (2) a September 15 follow-up examination; and (3) a September 15 mammogram. *Id.* at 411-12. The court noted as significant that the insured "was being monitored for the longstanding fibrocystic breast condition and not cancer

20

during the pre-coverage period." *Id.* at 412. Although these two conditions manifest themselves in the same area of the body and in similar ways, they are nevertheless "unrelated." *Id.* During the pre-existing condition period, neither the insured nor her physician had any reason to believe that the breast lumps were cancerous. *Id.* Instead, they attributed these symptoms to her fibrocystic breast condition. *Id.* The treatments actually related to cancer–including a biopsy, a lumpectomy, and radiation treatments–all occurred after the coverage period began. *Id.* at 412 n.7. Accordingly, summary judgment was properly granted to Pitcher, who was entitled to recover under the insurance policy. *Id.* at 418.

In an attempt to reconcile *Bullwinkel* with *Pitcher*, one court has concluded that the cases establish a rule that "although a plaintiff need not be definitely diagnosed with a condition during the treatment-free period there at least must have been some concern or suspicion at that time that the observed symptoms were caused by the particular condition in order for the patient to be considered as being treated or seen *for* the particular condition." *Goerig v. Phoenix Home Life Mut. Ins. Co.*, No. 97 C 1890, 1998 WL 801793, at *7 (N.D. Ill. Nov. 13, 1998). In other words, "it makes no sense to say that a doctor or care-provider treated a particular condition when he or she did not know that the condition existed." *Id.* In *Bullwinkel*, the insured and the doctor were concerned about cancer during the pre-existing condition period; in *Pitcher*, they were not. *Id.* The *Goerig* court found that the facts presented by the insured were closer to *Pitcher* than to *Bullwinkel*, because Goerig visited a doctor with symptoms that suggested merely a benign condition. *Id.* Goerig's symptoms "might imply any of a variety of maladies, or none at all." *Id.* (quoting *Bullwinkel*, 18 F.3d at 432).

After reviewing this precedent, the court concludes that Levin's visits to Dr. Shrifter and Dr. Turner more closely resemble the visits at issue in *Bullwinkel* than those in *Pitcher* or *Goerig.* As discussed above, there is no colorable argument that the symptoms Levin reported to Dr. Shrifter were trivial or inconclusive, in light of the significant impact they had on his life habits. Instead,

Levin attempts to distinguish his case from *Bullwinkel*, *Kirk*, and *Cury* on the ground that the consultations in these cases "specifically concerned the symptoms that ultimately led to disability." (Pl.'s Resp. at 3.)  In this court's view, Levin's doctor visits fall into the same category.  There is no indication here that Levin's symptoms could have been anything but dysphagia, whether or not it was diagnosed as such at the time.  Levin's contention that he did not complain of symptoms directly related to dysphagia is implausible, in light of the notes provided by Dr. Shrifter and Dr. Turner.  Instead, the symptoms he reported, from difficulty swallowing and ingesting solid foods to reduced salivary flow, are all symptoms of dysphagia–the very same symptoms that, as they worsened, ultimately led to his disability.  Putting aside the question of whether Dr. Shrifter was, as Dr. Flamburis suggests, amiss in not suggesting follow up treatment, it is nevertheless clear that Levin consulted with Dr. Shrifter regarding these symptoms.  As in *Bullwinkel*, then, Levin's visits to Dr. Shrifter and Dr. Turner "actually concerned" the condition that eventually disabled him.  Finally, as in *Bullwinkel*, there is reason to infer that the symptoms Levin reported to Dr. Shrifter and Dr. Turner were of dysphagia, Levin's disabling condition.  In fact, there is no evidence that any other malady caused Levin's symptoms.

Levin urges that his past medical history differentiates his case and renders it similar to *Pitcher* and *Goerig*.  But the critical difference in *Pitcher* and *Goerig* is that, in those cases, there were multiple possible diagnoses for the insured's condition.  In this case, the only proffered diagnosis of Levin's symptoms has always been dysphagia.  As both Dr. Flamburis and Dr. Hall have explained that Levin's dysphagia most likely results from his cancer and resulting radiation treatment, his past medication history does not provide an alternative cause for his symptoms.  Instead, it is merely an explanation for how Levin most likely acquired the condition.  Accordingly, the court concludes that Levin's visits to Dr. Shrifter and Dr. Turner did constitute medical treatment for dysphagia, his disabling condition.

## CONCLUSION

Because Levin's dysphagia was a pre-existing condition, under the definition set forth in the governing insurance Plan, his disability is excluded from coverage under the Plan's terms. Michael Levin's motion for summary judgment (26) is therefore denied, and Sun Life Assurance Company of Canada's motion (29) (docketed as a trial brief) is granted.

ENTER:

Dated: March 27, 2008

_____

REBECCA R. PALLMEYER
United States District Judge